STAR–KIST FOODS, INC., a corporation, et al., Plaintiffs,

v.

DIAKAN HOPE, S.A., a corporation and Polynesia Line, Ltd., a corporation, Defendants.

Complaint of DIAKAN HOPE, S.A., a corporation as owner of the M/V POLYNESIA DIAKAN, For Exoneration from or Limitation of Liability.

Nos. CV 75–1914 RF, CV 75–3706 RF.

United States District Court, C. D. California.

Dec. 2, 1976.

_____

4. See 58 Iowa L.Rev. supra at 373.

Ekdale & Shallender, San Pedro, Cal., for plaintiffs.

Lillick, McHose & Charles by Thomas F. Melchior, San Diego, Cal., for defendants Diakan Hope, etc.

Leo J. Vander Lans, Long Beach, Cal., for defendant Polynesia Line, Ltd., a corporation.

## JUDGMENT AND ORDER DIRECTING ARBITRATION AND STAYING PROCEEDINGS HEREIN

HAUK, District Judge.

WHEREAS, Diakan Hope, S.A. moved this Court to stay all further proceedings before this Court and to direct that all disputes between the parties be referred to arbitration in London; and

WHEREAS, said motion was heard on November 1 and November 8, 1976, and the Court having heard oral argument and considered the points and authorities submitted, the various papers and pleadings on file herein and documents presented at the hearing;

IT IS HEREBY ORDERED AND ADJUDGED THAT:

1. The actions herein are stayed and the parties herein are directed to arbitration in London pursuant to Clause 17 of the Charter Party dated September 18, 1972, a copy of which is attached as Appendix C to this Court's findings of fact and conclusions of law herein; and

2. The stay of these actions shall continue until otherwise ordered by this Court on good cause shown, and in any event at least until the London arbitration proceedings are completed and the award thereof is final; and

3. To prepare for said arbitration the parties shall have the opportunity for such discovery as they would be entitled to under the rules and jurisdiction of this Court, and this Court may exercise its continuing jurisdiction to entertain motions of the parties regarding discovery; and

4. All claims which have been made to date in a timely manner in the within actions shall be deemed timely made and not time barred in the London arbitration proceeding.

## DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

DIAKAN HOPE, S.A.'s motion to stay proceedings pending arbitration came on regularly for hearing on November 1 and 8, 1976, all the parties being present and represented by counsel and, after considering the points and authorities filed, the pleadings and records on file herein, and documents presented at the hearing, and after hearing oral argument, the Court makes and adopts the following Findings of Fact and Conclusions of Law, the Honorable A. Andrew Hauk presiding and acting for the Honorable Robert Firth by assignment of the full Court, Central District of California:

## FINDINGS OF FACT

1. On or about August 4, 1976, plaintiffs in Action No. CV–75–1914 RF, now pending in this Court, and Marine Chartering Co., Inc. and Polynesia Line, Ltd. (hereinafter "Charterers") entered into the Settlement Agreement.[1] In conjunction therewith plaintiffs in Action No. CV–75–1914 RF and Hartford Fire Insurance Company, Highlands Insurance Company and the Underwriters at Lloyds and London Companies subscribing Special Cargo Policy RAL

---

1. See Appendix A attached hereto.

6467 (said plaintiffs and insurers hereinafter referred to as "Cargo Interests") executed the Assignments to Charterers and Covenants.[2]

2. Pursuant to said Settlement Agreement and said Assignments to Charterers and Covenants Cargo Interests assigned to Charterers all their claims, demands, rights and/or causes of action which Cargo Interests had or may thereafter acquire against the Owners and/or Operators of the M/V POLYNESIA DIAKAN for or on account of the loss of freight and/or loss of and damage to cargo shipped from Pago Pago, American Samoa on board the M/V POLYNESIA DIAKAN, voyage 21N, in May 1975. By the terms of said Settlement Agreement and Assignments to Charterers and Covenants, Charterers now possess, own and control all claims, demands, rights and/or causes of action in the captioned actions against DIAKAN HOPE, S.A.

3. DIAKAN HOPE, S.A., owner of the M/V POLYNESIA DIAKAN, (hereinafter "Owners") and Charterers entered into a charter of the M/V POLYNESIA DIAKAN pursuant to the terms and conditions of that certain charter party dated September 18, 1972 with all addenda thereto.[3] Said charter party is a commercial agreement. Clause 17 of said charter party provides:

"That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London, one to be appointed by each of the parties hereto and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men."

4. Clause 17 of said charter party encompasses all claims, demands, rights, and/or causes of action of Charterers in the captioned actions whether owned directly or acquired by assignment or subrogation or otherwise.

5. DIAKAN HOPE, S.A. is a corporation organized and existing under and by virtue of the laws of a foreign country.

6. DIAKAN HOPE, S.A. has not waived its right to arbitration of disputes between Owners and Charterers. Charterers have suffered no prejudice as a consequence of DIAKAN HOPE, S.A. not demanding arbitration until August 17, 1976 or by reason of the consolidated litigation herein, to exist, Nos. CV 75–1914 RF and CV 75–3706 RF.

## CONCLUSIONS OF LAW

1. The aforementioned charter party contains an arbitration agreement arising out of a legal relationship which is commercial. Said arbitration agreement falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which is enforced in the United States in accordance with 9 U.S.C. § 201 *et seq.*[4]

2. Said charter party is a maritime transaction as defined in 9 U.S.C. § 1.[5] Clause 17 of the charter party is within the purview of 9 U.S.C. § 2[6] and is a written

---

2. See Appendix B attached hereto.

3. See Appendix C attached hereto.

4. See Appendix D attached hereto.

5. § 1. *"Maritime transactions" and "commerce" defined; exceptions to operation of title*

"Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.
July 30, 1947, c. 392, 61 Stat. 670.
 9 U.S.C. § 1.

6. § 2. *Validity, irrevocability, and enforcement of agreements to arbitrate*

A written provision in any maritime transaction or a contract evidencing a transaction

provision in a maritime transaction to settle by arbitration a controversy arising out of such transaction.

3. By virtue of said Settlement Agreement and Assignments to Charterers and Covenants, all claims, demands, rights and/or causes of action remaining in the captioned actions are between Owners and Charterers.

4. Said charter party, and Clause 17 thereof in particular, is a valid and enforceable agreement.

5. All claims, demands, rights and/or causes of actions in the captioned actions fall within Clause 17 of said charter party and Clause 17 requires that these disputes be referred to arbitration in London.

6. This Court, having jurisdiction over the parties and subject matter of this controversy, directs pursuant to 9 U.S.C. § 206 [7] that arbitration of all claims, demands, rights and/or causes of action in the captioned actions be held at London in accordance with Clause 17 of said charter party, and that the captioned actions be stayed pursuant to the order of this Court.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## APPENDIX A

### SETTLEMENT AGREEMENT

This settlement agreement is between the plaintiffs in Action No. CV–75–1914 RF, now pending in the United States District Court, Central District of California (hereinafter "Cargo Interests"), and Marine Chartering Co., Inc. and Polynesia Line, Ltd. (hereinafter referred to as "Charterers").

A. Charterers agree to pay to "Derby, Cook, Quinby & Tweedt, Trustees" the sum of $2,520,000.00 for the account of Cargo Interests on or before August 16, 1976.

B. In consideration of said payment Cargo Interests agree as follows:

1. If requested by Charterers, to execute a dismissal as to Charterers only of Action No. CV–75–1914 RF in the United States District Court, Central District of California, without costs to either party. Said dismissal shall be either with or without prejudice as Charterers may direct.

2. If requested by Charterers, to execute an assignment in mutually acceptable form whereby Cargo Interests assign and transfer to Charterers all claims which Cargo Interests may have against the Owners and/or Operators of the M/V POLYNESIA DIAKAN for loss of cargo carried on the M/V POLYNESIA DIAKAN on Voyage 21N. Cargo Interests further agree to afford Charterers reasonable cooperation and assistance in the prosecution of said assigned claims against the Owners or Managers of said vessel, provided that Charterers will bear all costs and expenses of such recovery action and will reimburse Cargo Interests for any reasonable expenses or costs incurred by them in rendering such assistance or cooperation.

3. If requested by Charterers, to execute a covenant not to sue Charterers or othewise take any action against them on account of loss or damage to cargo carried on Voyage 21N of the M/V POLYNESIA DIAKAN.

C. If Charterers, or either of them, recover from the Owners, Managers or Insurers of the M/V POLYNESIA DIAKAN on account of the assigned claim for loss of cargo carried on the M/V POLYNESIA DIAKAN, Voyage 21N, more than the total of $2,520,000.00 plus the expenses of such

involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
July 30, 1947, c. 392, 61 Stat. 670.
 9 U.S.C. § 2.

7. § 206. *Order to compel arbitration; appointment of arbitrators*

A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement. Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 693.
 9 U.S.C. § 206.

recovery action, then Charterers will pay to Cargo Interests one-half the amount of recovery which is in excess of said total of $2,520,000.00 plus the expenses of obtaining such recovery. It is expressly understood and agreed by Cargo Interests that Charterers have full power and authority to settle and/or terminate recovery efforts on the assigned claims without any prior consent or approval of Cargo Interests.

D. The agreed sum of $2,520,000.00 provided in Paragraph A will bear interest at the rate of 8% if not paid on or before August 16, 1976. If said sum and accrued interest are not paid by September 15, 1976, Cargo Interests may, at their sole .option, either affirm this agreement and institute legal action against Charterers to collect said sum plus interest at 8% from August 16, 1976, or Cargo Interests may cancel and revoke this settlement agreement by notice in writing delivered to Charterers' attorneys, Graham & James, at One Maritime Plaza, San Francisco, California 94111.

DATED: August 4, 1976.

CARGO INTERESTS
By DERBY, COOK, QUINBY & TWEEDT
By (s) Robert H. Thede
 Robert H. Thede
Their Attorneys

CHARTERERS
By GRAHAM & JAMES
By (s) Lester H. Clark
Their Attorneys

## APPENDIX B

### ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the under-signed hereby sell, assign and transfer unto Marine Chartering Co., Inc. and Polynesia Line, Ltd. all claims, demands, rights and/or causes of action which the undersigned may have or may hereafter acquire against the Owners and/or Operators of the M/V POLYNESIA DIAKAN for or on account of loss of freight or loss of and damage to the following cargo insured by the undersigned which was shipped from Pago Pago, American Samoa on the M/V POLYNESIA DIAKAN, Voyage 21N, during May 1975:

> Bs/L PP/LA 4—Cases Tuna
> B/L PP/LA Supp. 1—Gas Cylinders
> B/L PP/LA Supp. 2—General Cargo.

This assignment is intended to and does sell, assign and transfer all claims, demands, rights and/or causes of action which the undersigned may have or may hereafter acquire against the Owners and/or Operators of said M/V POLYNESIA DIAKAN relating to said cargo whether said claims, demands, rights and/or causes of action were acquired by subrogation or otherwise.

DATED: August 12, 1976

HARTFORD FIRE INSURANCE COMPANY
By (s) D. Kenyon, Supervisor
Its D. M. Claims

HIGHLANDS INSURANCE COMPANY
By (s) Leland D. Proimos
Its Claims Manager

Underwriters at LLOYDS AND LONDON COMPANIES subscribing Special Cargo Policy RAL 6467
By (s) Robert H. Thede
 Its Attorney

The undersigned, having executed a dismissal as to Polynesia Line, Ltd. in that certain action titled *Star-Kist Foods, Inc., et al. v. Diakan Hope, S.A., et al.*, being Action No. CV–75–1914–RF, pending in the United States District Court, Central District of California, and having received good and valuable consideration, hereby agree, covenant and promise not to file any suit in law, equity or admiralty or to take any other legal action whatsoever against Marine Chartering Co., Inc. or Polynesia Line, Ltd. on account of any claim, demand, right and/or cause of action which the undersigned may have acquired or may hereafter acquire, by subrogation or otherwise, for loss of freight or loss of or damage to the following shipments which were shipped on the M/V POLYNESIA DIAKAN Voyage 21N, from Pago Pago, American Samoa during May, 1975:

 B/L PP/LA 4—Cases Tuna
 B/L PP/LA Supp. 1—Gas Cylinders
 B/L PP/LA Supp. 2—General Cargo

DATED: August 12, 1976.

 HARTFORD FIRE INSURANCE COMPANY
 By (s) D. Kenyon, Supervisor
 Its D. M. Claims

 HIGHLANDS INSURANCE COMPANY
 By (s) Leland D. Proimos
 Its Claims Manager

 Underwriters at LLOYDS AND LONDON
 COMPANIES subscribing Special Cargo
 Policy RAL 6467
 By (s) Robert H. Thede
 Its Attorney

## ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby sell, assign and transfer unto Marine Chartering Co., Inc. and Polynesia Line, Ltd. all claims, demands, rights and/or causes of action which the undersigned may have or may hereafter acquire against the Owners and/or Operators of the M/V POLYNESIA DIAKAN for or on account of loss of freight or loss of and damage to the following cargo insured by the undersigned which was shipped from Pago Pago, American Samoa on the M/V POLYNESIA DIAKAN, Voyage 21N, during May 1975:

 Bs/L PP/LA 5 through 36—Tuna and Pet Food
 B/L PP/LA 37—58 Empty Gas Cylinders
 B/L PP/LA 38—3 Crates General Cargo
 B/L PP/LA 39—Propane Tank.

This assignment is intended to and does sell, assign and transfer all claims, demands, rights and/or causes of action which the undersigned may have or may hereafter acquire against the Owners and/or Operators of said M/V POLYNESIA DIAKAN relating to said cargo whether said claims, demands, rights and/or causes of action were acquired by subrogation or otherwise.

DATED: August 13, 1976

 INSURANCE COMPANY OF NORTH AMERICA
 By (s) L. J. Switz
 Its Ocean Claims Manager

 CALVERT FIRE INSURANCE COMPANY
 BY AMERICAN MARINE AGENCY, INC.,
 Managers
 By (s) Warren A. Rouse
 Its Vice President

 ST. PAUL FIRE & MARINE INSURANCE
 COMPANY
 By (s) Brian R. Deans
 Its Ocean Marine Mgr.

## COVENANT

The undersigned, having executed a dismissal as to Polynesia Line, Ltd. in that certain action titled *Star-Kist Foods, Inc., et al. v. Diakan Hope, S.A., et al.*, being Action No. CV–75–1914–RF, pending in the United States District Court, Central District of California, and having received good and valuable consideration, hereby agree, covenant and promise not to file any suit in law, equity or admiralty or to take any other legal action whatsoever against Marine Chartering Co., Inc. or Polynesia Line, Ltd. on account of any claim, demand, right and/or cause of action which the undersigned may have acquired or may hereafter acquire, by subrogation, or otherwise, for loss of freight or loss of or damage to the following shipments which were shipped on the M/V POLYNESIA DIAKAN Voyage 21N, from Pago Pago, American Samoa during May, 1975:

 Bs/L PP/LA 5 through 36—Tuna and Pet Food
 B/L PP/LA 37—58 Empty Gas Cylinders
 B/L PP/LA 38—3 Crates General Cargo
 B/L PP/LA 39—Propane Tank.

DATED: August 13, 1976.

 INSURANCE COMPANY OF NORTH AMERICA
 By (s) L. J. Switz
 Its Ocean Claims Manager

 CALVERT FIRE INSURANCE COMPANY
 BY AMERICAN MARINE AGENCY, INC.,
 Managers
 By (s) Warren A. Rouse
 Its Vice President

 ST. PAUL FIRE & MARINE INSURANCE
 COMPANY
 By (s) Brian R. Deans
 Its Ocean Marine Mgr.

## ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby sells, assigns and transfers unto Marine Chartering Co., Inc. and Polynesia Line, Ltd. all claims, demands, rights and/or causes of action which the undersigned may have or may hereafter acquire against the Owners and/or Operators of the M/V POLYNESIA DIAKAN for or on account of loss of freight or loss of and damage to the following shipments of cargo consigned to the undersigned which were shipped from Pago Pago, American Samoa on the M/V POLYNESIA DIAKAN, Voyage 21N, in May 1975:

 Bs/L PP/LA 5 through 36—Tuna and Pet Food
 B/L PP/LA 37—58 Empty Gas Cylinders
 B/L PP/LA 38—3 Crates General Cargo
 B/L PP/LA 39—Propane Tank.

The undersigned warrants that it was the owner of said shipments of tuna and pet food and bore the risk of loss of said gas cylinders, general cargo and propane tank at the time the same were lost by reason of the sinking of the M/V POLYNESIA DIAKAN; and it is now the owner of all claims for loss of and damage to said cargo and loss of the freight paid thereon, except to the extent such claims have passed, by subrogation or otherwise, to Insurance Company of North America, Calvert Insurance Company and St. Paul Fire & Marine Insurance Company.

DATED: August 10, 1976

 STAR–KIST FOODS, INC.
 By (s) Keith A. Houge
 Its Vice President

## COVENANT

The undersigned, having executed a dismissal as to Polynesia Line, Ltd. in that certain action titled *Star-Kist Foods, Inc., et al. v. Diakan Hope, S.A., et al.,* being Action No. CV–75–1914–RF, pending in the United States District Court, Central District of California, and having received good and valuable consideration, hereby agrees, covenants and promises not to file any suit in law, equity or admiralty or to take any other legal action against Marine Chartering Co., Inc. or Polynesia Line, Ltd. on account of any claim, demand, right and/or cause of action for or on account of any loss of freight or loss of or damage to any of the following shipments carried on the M/V POLYNESIA DIAKAN on Voyage 21N of said vessel:

> Bs/L PP/LA 5 through 36—Tuna and Pet Food
> B/L PP/LA 37—58 Empty Gas Cylinders
> B/L PP/LA 38—3 Crates General Cargo
> B/L PP/LA 39—Propane Tank

DATED: August 10, 1976

> STAR–KIST FOODS, INC.
> By (s) Keith A. Houge
> Its Vice President

## ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby sells, assigns and transfers unto Marine Chartering Co., Inc. and Polynesia Line, Ltd. all claims, demands, rights and/or causes of action which the undersigned may have or may hereafter acquire against the Owners and/or Operators of the M/V POLYNESIA DIAKAN for or on account of loss of freight or loss of and damage to the following shipments of cargo consigned to the undersigned which were shipped from Pago Pago, American Samoa on the M/V POLYNESIA DIAKAN, Voyage 21N, in May 1975:

> B/L PP/LA 4—Cases Tuna
> PP/LA Supp. 1—Gas Cylinders
> PP/LA Supp. 2—General Cargo.

The undersigned warrants that it was the owner of said shipments of tuna and bore the risk of loss of said gas cylinders and general cargo at the time the same were lost by reason of the sinking of the M/V POLYNESIA DIAKAN; and it is now the owner of all claims for loss of and damage to said cargo and loss of the freight paid thereon, except to the extent such claims have passed, by subrogation or otherwise, to Hartford Fire Insurance Company, Highlands Insurance Company and Underwriters of Lloyds and London Companies subscribing Special Cargo Policy RAL 6467.

DATED: August 13, 1976

> VAN CAMP SEA FOOD COMPANY,
> DIVISION OF RALSTON PURINA
> COMPANY
> By (s) Stephen A. Brennen
> S. A Brennen
> Its President

## APPENDIX C

Cable Phone: (415) 771–6400
"CHARTERING" SAN FRANCISCO Telex: (RCA) 27337
New Boe Code TWX: (ITT) 910–372–7388

FURNESS WITHY (CHARTERING) LTD.
105 Fenchurch Street
London, EC3M 5HH
Telephone: 01–481 2525
Telex: 888512

MARINE CHARTERING CO., INC.
STEAMSHIP OPERATORS • AGENTS • BROKERS
630 BEACH STREET • SAN FRANCISCO, CALIFORNIA 94109

## TIME CHARTER
Government Form
Approved by the New York Produce Exchange
November 6th, 1913—Amended October 20th, 1921;
August 6th, 1931; October 3rd, 1946

THIS CHARTER PARTY, made and concluded in LONDON, 18th day of SEPTEMBER 1972 Between EASTERN MEDITERRANEAN MARITIME (LIECHTENSTEIN) LIMITED, disponent Owners of the good Greek flag Motorship DIAKAN HOPE (ex "WESERFAHRT") built 1961 of 4206.25 tons register, and 2366.66 tons net register, having engines of 4900 indicated horse power and with hull, machinery and equipment in a thoroughly efficient state, and classed HIGHEST CLASS BUREAU VERITAS at _____ of about 418.262 cubic feet bale capacity including 8050 cubic feet refrigerated space—capable of freezing up to –15° Celcius and about 6360 metric tons deadweight capacity stores not exceeding 150 metric tons on a draft of 22 feet 4.5 inches on Summer freeboard, inclusive of permanent bunkers, which are of the capacity of about 450 tons fuel oil and about 50 tons of diesel oil and capable of steaming, fully laden, under good weather conditions about 15 knots on a consumption of about 15 tons of fuel oil of maximum viscosity 1000 Secs Redwood No. 1 Scale at 100° Fahrenheit plus about 1½ tons diesel oil now trading and MARINE CHARTERING COMPANY, INC. Charterers of the City of SAN FRANCISCO.

WITNESSETH, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery for eighteen months trading, one month more or less in Charterers option within below mentioned trading limits. Charterers to have liberty to sublet the vessel for Charterers remaining responsible for the fulfillment of this Charter Party.

Vessel to be placed at the disposal of the Charterers, at a safe port CALIFORNIA (U.S.A.), port in Charterers' option (see Clause 55) in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her delivery to be ready to receive cargo with clean-swept holds free of smell all cargo battens fitted and tight, staunch, strong and in every way fitted for the service intended, having water ballast, winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same time (and with full complement of officers, seamen, engineers, and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, including petroleum or its products , in proper containers, excluding as per Clause 45 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk, all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and or ports WORLDWIDE WITHIN INSTITUTE WARRANTY LIMITS, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic, also excluding COMMUNIST/COMMUNIST CON-

TROLLED TERRITORIES, CUBA, ISRAEL, NORTH & SOUTH VIETNAM and NORTH KOREA as the Charterers or their Agents shall direct on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees and Greek Consular Fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery, cargo gear and equipment for and during the service and to comply with safety and health regulations air pollution and water pollution regulations in force in any of the ports of call during the service and have on board valid certifications including certificate of proof of financial responsibility required by the U. S. Water Quality Improvement Act or other similar laws.

2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed. Port Charges, Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes earned or ports visited while vessel is employed under this charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the posted prices in the respective ports or nearest port with installation the vessel to be delivered with minimum 50 tons/maximum 100 tons fuel oil and minimum 25 tons/maximum 50 tons diesel and to be re-delivered with minimum 50 tons/maximum 100 tons fuel oil and minimum 25 tons/maximum 50 tons diesel but not less than is necessary to reach nearest bunkering port where fuel available at time of redelivery.

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of per Clause 50 United States Currency per day commencing on and from the day of her delivery, as aforesaid, and at and after the same pro rata rate for any part of a day hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at a safe port in Charterers option U.K./CONTINENT, U. S. West Coast, British Columbia, U. S. Gulf Carribean, U. S. East Coast, East Coast Canada excluding St. Lawrence unless otherwise mutually agreed. See Clause 56.

5. Payment of said hire to be made in New York in cash in United States Currency, semi-monthly in advance, and for the last half month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a. m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p. m., but if required by Charterers, they to have the privilege of using vessel at once, such hours actually used to count as hire.

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely lie aground.

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the

Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners US $5.00 per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense (see Clause 57).

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman and other persons authorized by Charterers, etc., Charterers paying at the current rate per meal, for all such victualling on submission of records.

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.

12. That the Captain shall use diligence in caring for the ventilation of the cargo.

13. (This clause deleted).

14. That if required by Charterers, time not to commence before 16th October 1972 and should vessel not have given written notice of readiness on or before 31st October 1972 but not later than 4 p. m. Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

15. That in the event of the loss of time from deficiency of documents certificates, men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire. If vessel goes off hire vessel to return on hire immediately vessel ready again. This applies to when vessel in port. It is understood that if vessel is at sea and goes off hire then she would not come back on hire again until in same position as when went off-hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion, General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules 1950 _____ at such port or place in the United States as may be selected by the carrier and as to matters not provided for by these Rules, according to the laws and usages at the port of United Kingdom. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.

See New Jason Clause attached.

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted, Owners undertake to clean vessel's bottom after 9 months service and then not another bottom cleaning until the end of the timecharter and payment of the hire to be suspended until she is again in proper state for the service.

Vessel was last drydocked 1st September 1972.

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to five tons, also providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel a minimum of 4 cluster lights per hatch, lanterns and oil for night work, and vessel to give use of electric light when so fitted and maintain same in efficient working order but any additional lights over those on board to be at Charterers' expense. The Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging; steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or insufficient power to operate winches simultaneously, or any other deficiencies of documents, certificates, gear, crew or equipment, for which the vessel is responsible under this Charter Party, Owners to pay for shore engine, or engines in lieu thereof, if required, and pay any loss of time occasioned thereby and pay for all cost differentials and/or any additional expenses of stevedores other shore labour, standby time and other charges.

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on

the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels, etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:

## U.S.A. Clause Paramount

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

## Both-to-Blame Collision Clause as attached

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging.

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, acts of pilots and tugs, insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of 1¼% per cent is payable by the Vessel and Owners to FURNESS WITHY (CHARTERING) LTD. LONDON (also 1¼% to FURNESS WITHY (CHARTERING) LTD. Vancouver, on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

28. An address commission of 2½ per cent payable to MARINE CHARTERING CO. INC., on the hire earned and paid under this Charter. Clauses Nos. 29/59, as attached to be considered as incorporated in this Charter Party.

Printed by Parry's,
4 Fenchurch Bldgs. London E.C. 3
By permission of the New York Produce Exchange
Signed as Charterers:
MARINE CHARTERING CO., INC.

(s) Jacob Nebeling
 Jacob Nebeling, Vice President

Signed on behalf of the Disponent Owners by
Telex Authority from
THENAMARIS CORPORATION S.A., of PIRAEUS
for and on behalf of
EASTERN MEDITERRANEAN MARITIME (LONDON) LTD.

_____
 signature
As Agents only 6–17–1975

Deft's
Exhibit J(15)
for Identification
E. Kent Snyder, N.P. (3)

<u>m. v. "DIAKAN HOPE" (ex "WESERFAHRT") C/P 18.9.72</u>

29. <u>DEDUCTIONS FROM CHARTERHIRE CLAUSE</u>: Charterers have the right to withhold from charterhire during the period of this charter such amounts due them for offhire and Owners' disbursements, but proper supporting statements to be sent to Owners promptly. Charterers have the right to withhold from last month's hire Owners' estimated advances and disbursements, including any fines and any other amounts to be for Owners' account, and also the value of redelivery bunker fuel. However, final accounting to be arranged by Charterers as promptly as possible.

30. <u>OVERTIME CLAUSE</u>: Ship's crew to shape up cargo gear and hatches as far as possible before arrival at loading and/or discharging docks or places, so that loading and/or discharging can commence immediately.

31. <u>STEVEDORE DAMAGE CLAUSE</u>: Charterers are to be responsible for any physical damage done to the vessel by stevedores on loading and/or discharging only if such damage is occasioned by the stevedores' negligence, breach of warranty or breach of contract and the Master advises Charterers, or Charterers' agents in writing, within twenty-four hours after occurrence of the specific damage sustained by the vessel for which Charterers are liable, and, further provided the Master has notified the parties who have caused this damage, in writing, and endeavours to obtain their admission of liability. In the event stevedores sue Charterers for recovery of damages paid to Owners, which had not been reported to Charterers in the above manner, Owners to indemnify Charterers.

32. <u>TOWAGE AND PILOTAGE</u>: The Owners authorize Charterers, as agents of and on behalf of the Owners, and on behalf of the vessel, to arrange and contract for any towage, pilotage or like services on any usual or customary terms and/or those terms offered or required by the towing companies employed where such services are furnished including but not by way of limitation, so-called Pilotage Clauses, such as those making Pilots or Tugboat Captains and the like, or others, servants of the assisted vessel and of her Owners, and the Owners ratify any such contract made by the Charterers.

33. <u>DEVIATION</u>: Should the vessel put back on a voyage by reason of an accident or breakdown, deficiency, accident or illness of crew, or for vessel's business, the hire shall be suspended from the time of her putting back until she regains her former position, or a position equidistant to her next destination, and resumes the voyage therefrom. All expenses during such time, including port charges, agency fees, fuel consumed and other expenses which normally would be for Charterers' account, shall be for the account of the Owners.

34. <u>BUNKERING</u>: Charterers to have the privilege to buy bunkers under Owners' contract.

35. <u>HOUSEFLAG CLAUSE</u>: Charterers have the privilege of flying their houseflag and of painting their markings on vessel's smokestack and sides. Such painting, removal and reinstation of Owners' original markings to be in Charterers' time and at Charterers' expense.

36. <u>CONDITION OF VESSEL DURING TIMECHARTER</u>: Owners will keep the vessel's appearance neat and its coat of paint in good condition.

37. <u>FLAG AND CREW DISCRIMINATION</u>: In the event that the vessel is delayed by strikes, lockouts, labour stoppages, acts of government, or any other difficulties due to the flag or ownership of the vessel or the nationality, such time lost is to be for Owners' account, including bunker fuel consumed during such periods. If the vessel is idle for sixty (60) consecutive days, Charterers have the privilege of canceling the balance of the Charter. Owners' option to change vessel's flag with Charterers' concurrence.

38. <u>COMMUNIST COUNTRIES</u>: Owners warrant that the vessel has not touched at ports of or traded with any Communist countries within the last six months (including the Peoples Republic of China, Macao, North Vietnam, North Korea and Cuba) which would restrict or impede the ability of the vessel to call at ports of or trade with the United States of America or any other nation imposing similar restrictions on trade with Communist countries.

39. **GENERAL AVERAGE**: In the event of General Average, Charterers to act as Owners' agents' with respect to the collection of General Average deposits and securities from the parties in the venture.

40. **PADEYE**: If required vessel to be fitted with suitable padeyes to secure deck cargo of containers, lumber, logs, or other deck cargo. Charterers may install additional padeyes, ringbolts and similar fittings for the securing of cars, such fittings to become ship's property with installation. Charterers to remove only those fittings which if remaining on board would interfere with the normal working of the vessel. All installation and removal of same to be at Charterers' time and expense.

41. **DECKLOAD**: If the vessel is required to carry a deck cargo, Charterers may require vessel to press all empty tanks with ballast. Vessel to load, stow and secure under Master's supervision.

42. **INSULATED CUBIC CAPACITY**: The entire insulated cubic capacity will be fit and available for the stowage of frozen goods, including coaming space, if included in the tendered insulated cubic capacity.

43. **NON–REFRIGERATED CARGO**: Charterers have the liberty to load general cargo in refrigerated cargo spaces including explosives, inflammable or dangerous goods, if packed in accordance with U.S. Coast Guard regulations or any other regulations applicable in the respective ports, provided that such goods are not likely to contaminate the vessel's fittings, decks, bins, gratings or insulation, as per Clause 45.

44. **PROTECTIVE CLAUSES**: New Jason Clause, New Both-to-Blame Collision Clause, Canadian Clause Paramount (as applicable) and Chamber of Shipping War Risk Clauses No. 1 and No. 2 inclusive, as attached, are hereby deemed to be incorporated in this Charter Party.

45. **DANGEROUS CARGOES**: Asphalt and pitch in bulk, bulk ammonium nitrate excluded. Arms, ammunitions, explosives, nuclear and radioactive materials, inflammable and other dangerous cargoes excluded unless packed, loaded, stowed and discharged in accordance with B.O.T. and/or U.S.C.G. regulations but maximum 250 long tons. Military arms and ammunitions always excluded but in any event not more than 75 tons without Owners' agreement. Any additional bonuses payable to crew owing to the nature of cargo carried to be paid by Charterers in accordance with the Greek collective agreement.

46. **CLEANLINESS CLAUSE**: Vessel to tender with clean swept holds (including overhead girders, deckbeams, etc.) and free of odor.

47. **THERMOMETERS**: Thermometers for refrigerated compartments as on board. If refrigerated cargo is being carried Master to submit to Charterers reefer log with daily temperature readings.

48. **GRATINGS**: The vessel will be fitted with portable gratings on all steel decks. If Charterers should break any gratings, the Charterers will reimburse the Owners on the basis of $0.20 per broken lath. This clause applies to refrigerated compartments only.

49. **RADIO**: Radio must be capable of receiving and transmitting usual traffic relative to stations, as mentioned; Captain and Charterers to work out a communications system. Vessel has strong radio telephone only.

U.S. Coast Guard; Marine Operators of Norfolk, Jacksonville, Miami, Trinidad, La Guaira, Aruba, New York, Kingston, Antigua, Barbados, and Puerto Rico.

50. With reference to Clause 4 rates of hire to be as follows:—

U.S.$ 1550 (one thousand five hundred and fifty U.S. Dollars) including Crew's and Officers' overtime for the first period of 12 months.

U.S.$ 1570 (one thousand five hundred and seventy U.S. Dollars) including Crew's and Officers' overtime for the last 6 months.

51. Vessel has 2 decks (3rd deck in Nos. 1 and 5) with flush tween decks, engines and bridge aft. Vessel is fitted with steel cargo battens, which are irremovable.

Vessel has 5 holds and 5 hatches; hatch sizes are about:—

36 feet, 29½ feet, 36 feet, 28¼ feet, 39¼ feet all by 19¾ feet; plus one small hatch serving the refrigerated space aft of the bridge.

Vessel's derricks are as follows:—

1 at 30 tons, 10 at 5/10 tons and 2 at 1.6 tons for the refrigerated space.

Vessel's winches are:—

10 at 2½/5 tons plus 2 at 2/5 tons. Winch controls are located so that each pair of winches (except Nos. 1) can be controlled by one winchman.

Vessel is grainfitted as per S.O.L.A.S. 1960.

Vessel is Great Lakes fitted.

Vessel has Mc Gregor single pull hatch covers. The tweendeck hatch pontoons being mechanically operated by derricks.

Vessel's grain cubic is about 435942 cubic feet.

52. Vessel is fitted with a wooden ceiling and owners will deliver vessel with vessel with wooden tank top sheathing in order for the operation of fork lift trucks of about 5000 lbs. weight plus about 3000 lbs. load.

When fork lifts are working on ceiling of lower holds owners recommend that steel sheets be used in order to protect the flooring and ovoid damage which if there is any will be for Charterers account.

53. Vessel's L.O.A. is 130 metres; L.B.P. is 120 metres and breadth is 16.80 metres. Vessel's fresh water capacity is about 110 tons.

54. Owners agree Charterers' use of after peak tank for soya bean oil provided vessel can carry sufficient fresh water for the voyage ordered and tank cleaning and pumping to be for Charterers' account.

55. Owners to give approximate notice on fixing then 15 and 10 days approximate notice also 5 and 3 days definite notice of delivery to Charterers. Charterers to declare delivery port not later than 15 days before expected delivery.

56. Charterers to give approximate port of redelivery 30 days before expected redelivery and firm notice of port of redelivery 15 days before expected redelivery.

57. Vessel has 3 double cabins for passengers and Charterers have the right to utilize same paying U.S.$ 5.00 per passenger per day—see Clause 7.

58. On hire/off hire surveys shall be waived as vessel will not carry any bulk cargo requiring mechanical discharging equipment, but Charterers will agree to hold condition survey in the event of any bulk cargo operation being contemplated.

59. Vessel's cargo gear has certificate for operating in Union Purchase at 2.5 tons S.W.L.

Owners will allow Charterers to up grade to 4 tons S.W.L. Union Purchase to be approved by Ships Classification Society at Charterers' time and expense. Owners accept up to a maximum of U.S.$ 1000.00 for Owners account for initial cost of materials required for upgrading of the cargo gear to 4 tons S.W.L. Union Purchase.

GENERAL PARAMOUNT CLAUSE: This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels 25th August 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase

of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the carrier of any statutory protection or exemption from, or limitation of, liability.

BOTH–TO–BLAME COLLISION CLAUSE: If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel the owners of the cargo carried hereunder will indemnify, the carrier against all loss or liability to the other or noncarrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying vessel or carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

AMENDED JASON CLAUSE: In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Carrier is not responsible by statute, contract, or otherwise, the cargo, shippers, consignees, or owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.

CHAMBER OF SHIPPING WAR RISKS CLAUSES 1 AND 2:

1. No bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charter Party as ordered by Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

2. The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or any persons acting or purporting to act with the authority of such Government or any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or direction shall be in fulfilment of the Contract voyage and the freight shall be payable accordingly.

⊕ Furness Withy (Chartering) Ltd.

105 Fenchurch Street London EC3M 5HH
Telephone 01—481 2525 Telex 388512 Telegrams Wellchar

4th October 1972

Extension Our reference Your reference

m.v. "DIAKAN HOPE" (ex "WESERFAHRT")
Addendum No.1 to Charter Party dated 18/9/1972

IT IS THIS DAY MUTUALLY AGREED that the cancelling date as stated in Clause 14 of the above Charter Party is now extended to the 5th November 1972.

All other terms, conditions and exceptions of the Charter Party remaining unaltered.

| For Charterers<br>Marine Chartering<br>Co., Inc. | Signed on behalf of the Disponent Owners by<br>Telex Authority from<br>THENAMARIS CORPORATION S.A., of PIRAEUS<br>for and on behalf of<br>EASTERN MEDITERRANEAN MARITIME (LONDON) LIMITED |

J. Nebeling
Vice President

As Agents only

MEMORANDUM OF AGREEMENT

DATED: October 31, 1972
M/V : DIAKAN HOPE
CHARTER PARTY: London, September 18, 1972

It is this day mutually agreed between Charterers, MARINE CHARTERING CO., INC. of San Francisco, and Polynesia Line, Limited, that said charter be sublet to Polynesia Line, Limited, in considerations of fees payable by Polynesia Line, Limited to MARINE CHARTERING CO., INC. according to management contract. It is further agreed that Polynesia Line, Limited will assume the full responsibility for the fulfillment of said charter and will hold MARINE CHARTERING CO., INC. harmless from any damage or disputes whatsoever arising out of this charter.

All other terms of captioned Charter Party will remain unaltered and in full force.

MARINE CHARTERING CO., INC. Polynesia Line, Limited

(s) A. L. Bleicher (s) Jorgen With-Seidelin
 Captain A. L. Bleicher Jorgen With-Seidelin
 Vice President President

Piraeus, 3rd August, 1973

M/S POLYNESIA DIAKAN ex Diakan Hope
Addendum to C/P dated London Sept. 18, 1972

Agreement has been reached between Eastern Mediterranean Maritime (Liechtenstein) Ltd, Disponent Owners of this vessel, and DIAKAN SHIPPING S.A. Managers of this vessel, and with consent and concurrence of Marine Chartering Corporation Charterers of this vessel, that the name of disponent Owners shown on line No. 2 of this C/P is to be deleted and the name of DIAKAN SHIPPING S.A. is to be inserted.

Consequently, all rights, duties, obligations, liabilities and warranties of disponent Owners under this Charter Party, shall be transferred to DIAKAN SHIPPING S.A. This agreement takes effect on 21st August 1973.

In view of this agreement, commencing with the next hire payment due to be paid by Charterers on or about August 15, 1973 hire is henceforth to be paid to National Westminster Bank, 27 St. Mary's Axe London EC 3A 8AE, for account of DIAKAN SHIPPING S.A.

All other terms and conditions of this Charter Party remain in force without change.

EASTERN MEDITERRANEAN MARITIME LTD
 ex disponent Owners

DIAKAN SHIPPING S.A.
 Ship's Managers
 (s) George D. Diakopolous

MARINE CHARTERING COMPANY, INC.,
Charterers
(s) A. L. Bleicher

MEMORANDUM OF AGREEMENT

Dated August 3, 1973
M/V "POLYNESIA DIAKAN" ex Diakan Hope
Charter Party dated 13th September, 1972, as per copy attached.

It is this day mutually agreed between Charterers, MARINE CHARTERING CO., INC. of San Francisco, and POLYNESIA LINE, LIMITED of Nassau, Bahamas that Addendum dated Piraeus, 3rd August, 1973, to said Charter be sublet on the identical terms, conditions and rate of said Charter to POLYNESIA LINE, Nassau, Bahamas.

MARINE CHARTERING CO., INC.

POLYNESIA LINE, LIMITED

By (s) Jacob Nebeling
 Jacob Nebeling, President

By (s) A. L. Bleicher
 Captain A. L. Bleicher
 Vice President

# ⓌⓇ Furness Withy (Chartering) Ltd.

**105 Fenchurch Street London EC3M 5HH (Registered Office)**
**Telephone 01–481 2525 Telex 888512 Telegrams Wellchar**

15th February 1974.

**Extension** **Our reference** **Your reference**

### mv "POLYNESIA DIAKAN"
### (ex "DIAKAN HOPE")
### ADDENDUM NO. 2 TO CHARTER PARTY DATED 18.9.1972

IT IS THIS DAY MUTUALLY AGREED THAT the above Charter Party is extended for a further period of 12 (twelve) months, one month more or less in Charterer's option.

This is to be in direct continuation of the above Charter Party as and from the 1st May 1974.

Rate of hire to be increased to US $3000 (three thousand US dollars) per day or pro rata as and from the 1st May 1974.

It is also agreed that:

Vessel to be dry docked in Los Angeles prior to the 1st June 1974, exact time to be agreed between Owners and Charterers.

Owners to permit Charterers to effect alterations to winches system as per John V. Walsh Report No. 137473 dated 7th August 1973 at Charterer's time and expense.

The Charter Party to include:

International Labour Organization Safety Clause

"It is understood that, if necessary, vessel will comply with any safety regulations and/or requirements in effect at ports of loading and/or discharging, particularly the United States Department of Labour Safety and health regulations set forth in Part III of the Federal Register, although other provisions of this Timecharter make it responsibility of the Owners, it is agreed that should the vessel not meet the rules and regulations, Owners will make immediate corrective measure and that any stevedore standby time and expense involved, including off-hire, will be for Owners account. Vessel has valid certificates including cargo gear.

Vessel to carry maximum permissible number of refrigerated containers on deck, if required by Charterers. Charterers to supply convertors and all wiring for convertors. Owners to supply power as available on board.

Owners to allow Charterers to load containers on hatch covers at Charterers risk and expense up to maximum safe load. Charterers also to have all the precautions for the safe stowage and securing and to be responsible for any damages to cargo and/or to the ship arising therefrom.

It is also agreed in Clause 57 that the compensation should be US $10.00 instead of US $5.00 per passenger daily.

All other terms, conditions and exceptions of Charter Party (including redelivery) to remain unaltered.

For DIAKAN SHIPPING S.A.
as Disponent Owners of
M. V. POLYNESIA DIAKAN ex DIAKAN HOPE
The President
(s) George D. Diakopoulos
George D. Diakopoulos

MARINE CHARTERING CO., INC.
as Charterers
(s) A. L. Bleicher
Capt. A. L. Bleicher,
Vice President

**1240** 

> FURNESS WITHY (CHARTERING) LIMITED
> 105 FENCHURCH STREET
> LONDON, EC3M 5HH

3 April 1975

## M/V POLYNESIA DIAKAN
### (EX DIAKAN HOPE)

### CHARTER PARTY DATED 18 SEPTEMBER 1972

### ADDENDUM #3

IT IS THIS DAY MUTUALLY AGREED THAT the above Charter Party is extended for a further Round Voyage in direct continuation from end of May 1975.

Charterers have the option of a second round voyage, such option to be declared by Charterers to Owners latest on leaving last outward port U.S.A. on first round voyage.

Rate for first additional voyage and for second additional voyage if declared, to be increased to US$3400 per day and prorata for any part of a day, commencing with the completion of discharging of all northbound cargo on the present voyage.

Otherwise all terms, conditions, and exceptions in Charter Party dated 18 September 1972 and Addenda Numbers 1 and 2 to remain unaltered.

MARINE CHARTERING CO., INC.
As Charterers

| | |
|---|---|
| (s) Jacob Nebeling<br>Jacob Nebeling<br>President | For DIAKAN SHIPPING SA<br>as Disponent Owners of<br>MV POLYNESIA DIAKAN ex DIAKAN HOPE<br>The President<br>(s) George D. Diakopoulos<br>George D. Diakopoulos |

### MEMORANDUM OF AGREEMENT

DATED April 3, 1975
M/V POLYNESIA DIAKAN, EX DIAKAN HOPE
CHARTER PARTY dated 18 September 1972

It is this day mutually agreed between Charterers, MARINE CHARTERING CO., INC. of San Francisco, and POLYNESIA LINE, LIMITED, that Addendum #3 to said charter be sublet to POLYNESIA LINE, LIMITED, in consideration of fees paid by POLYNESIA LINE, LIMITED to MARINE CHARTERING CO., INC. according to management contract. It is further agreed that POLYNESIA LINE, LIMITED will assume the full responsibility for the fulfillment of said addendum and will hold MARINE CHARTERING CO., INC. harmless from any damage or disputes whatsoever arising out of this charter.

All other terms of captioned Charter Party will remain unaltered and in full force.

| | |
|---|---|
| MARINE CHARTERING CO., INC.<br>(s) A. L. Bleicher<br>Captain A. L. Bleicher<br>Vice President | POLYNESIA LINE, LIMITED<br>(s) Jorgen With-Seidelin<br>Jorgen With-Seidelin<br>President |

# APPENDIX D

# CHAPTER 2.—CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

Sec.
201. Enforcement of Convention.
202. Agreement or award falling under the Convention.
203. Jurisdiction; amount in controversy.
204. Venue.

Sec.
205. Removal of cases from State courts.
206. Order to compel arbitration; appointment of arbitrators.
207. Award of arbitrators; confirmation; jurisdiction; proceeding.
208. Chapter 1; residual application.

**1970 Amendment.** Pub.L. 91–368, § 1, July 31, 1970, 84 Stat 692, added the heading for chapter 2 and the analysis of sections for such chapter.

## § 201. Enforcement of Convention

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.

Added Pub.L. 91–368, § 1, July 31, 1970. 84 Stat. 692.

### Convention on the Recognition and Enforcement of Foreign Arbitral Awards

#### Article I

1. This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

2. The term "arbitral awards" shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted.

3. When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

#### Article II

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

#### Article III

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

#### Article IV

1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:
(a) The duly authenticated original award or a duly certified copy thereof;
(b) The original agreement referred to in article II or a duly certified copy thereof.
2. If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for recognition and enforcement of the award shall produce a translation of these documents into such language. The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent.

#### Article V

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that county; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

---

### Article VI

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

### Article VII

1. The provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States nor deprive any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the county where such award is sought to be relied upon.

2. The Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention on the Execution of Foreign Arbitral Awards of 1927 [27 LNTS 157; 92 LNTS 301] shall cease to have effect between Contracting States on their becoming bound and to the extent that they become bound, by this Convention.

### Article VIII

1. This Convention shall be open until 31 December 1958 for signature on behalf of any Member of the United Nations and also on behalf of any other State which is or hereafter becomes a member of any specialized agency of the United Nations, or which is or hereafter becomes a party to the Statute of the International Court of Justice [T.S. 993; 59 Stat. 1055], or any other State to which an invitation has been addressed by the General Assembly of the United Nations.

2. This Convention shall be ratified and the instrument of ratification shall be deposited with the Secretary-General of the United Nations.

### Article IX

1. This Convention shall be open for accession to all States referred to in article VIII.

2. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

### Article X

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

### Article XI

In the case of a federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal authority, the obligations of the federal Government shall to this extent be the same as those of Contracting States which are not federal States;

(b) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent states or provinces which are not, under the constitutional system of the federation, bound to take legislative action, the federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of constituent states or provinces at the earliest possible moment;

(c) A federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the federation and its constituent units in regard to any particular provision of this Convention, showing the extent to which effect has been given to chat provision by legislative or other action.

### Article XII

1. This Convention shall come into force on the ninetieth day following the date of deposit of the third instrument of ratification or accession.

2. For each State ratifying or acceding to this Convention after the deposit of the third instrument of ratification or accession, this Convention shall enter into force on the ninetieth day after deposit by such State of its instrument of ratification or accession.

### Article XIII

1. Any Contracting State may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation shall take effect one year after the date of receipt of the notification by the Secretary-General.

2. Any State which has made a declaration or notification under article X may, at any time thereafter, by notification to the Secretary-General of the United Nations, declare that this Convention shall cease to extend to the territory concerned one year after the date of the receipt of the notification by the Secretary-General.

3. This Convention shall continue to be applicable to arbitral awards in respect of which recognition or enforcement proceedings have been instituted before the denunciation takes effect.

### Article XIV

A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention.

### Article XV

The Secretary-General of the United Nations shall notify the States contemplated in article VIII of the following:
 (a) Signatures and ratifications in accordance with article VIII;
 (b) Accessions in accordance with article IX;
 (c) Declarations and notifications under articles I, X and XI;
 (d) The date upon which this Convention enters into force in accordance with article XII;
 (e) Denunciations and notifications in accordance with article XIII.

### Article XVI

1. This Convention, of which the Chinese, English, French, Russian and Spanish texts shall be equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit a certified copy of this Convention to the States contemplated in article VIII.

Done at New York June 10, 1958; entered into force for the United States December 29, 1970, subject to declarations.
21 UST 2517; TIAS 6997;
Implementing Legislation Pub.L. 91–368, 84 Stat. 692, 9 USC 201–208
States which are parties:

| | |
|---|---|
| Austria [1] | Madagascar [15] |
| Botswana [2] | Mexico |
| Bulgaria [3] | Morocco [16] |
| Byelorussian Soviet Socialist Rep. [4] | Netherlands [17] |
| Central African Republic [5] | Niger |
| Czechoslovakia [6] | Nigeria [18] |
| Denmark [7] | Norway [19] |
| Ecuador [8] | Philippines [20] |
| Egypt | Poland [21] |
| Finland | Romania [22] |
| France [9] | Sri Lanka (Ceylon) |
| Germany, Fed. Rep.[10] | Sweden |
| Ghana | Switzerland [23] |
| Greece | Syrian Arab Rep. |
| Hungary [11] | Tanzania [24] |
| India [12] | Thailand |
| Israel | Trinidad and Tobago [25] |
| Italy | Tunisia [26] |
| Japan [13] | Ukrainian Soviet Socialist Rep.[27] |
| Khmer Rep. | Union of Soviet Socialist Reps.[28] |
| Korea [14] | United States [29] |

### § 202. Agreement or award falling under the Convention

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that rela-

tionship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 692.

### § 203. Jurisdiction; amount in controversy

An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 692.

### § 204. Venue

An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.

Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 692.

### § 205. Removal of cases from State courts

Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.

Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 692.

### § 206. Order to compel arbitration; appointment of arbitrators

A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 693.

### § 207. Award of arbitrators; confirmation; jurisdiction; proceeding

Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 693.

§ 208. Chapter 1; residual application

Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States.

Added Pub.L. 91–368, § 1, July 31, 1970, 84 Stat. 693.

9 U.S.C. § 206 et seq.